**2018 WI 81**

# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2015AP2457 |
| COMPLETE TITLE: | American Family Mutual Insurance Company, State Auto Insurance Company of Wisconsin, Property and Casualty Insurance Company of Hartford, Fay Walters and Farmers Insurance Exchange,<br>        Plaintiffs,<br>H.O.L.I.E. of Greenfield Avenue, Inc., Dennis Kleinhans, Dorothy Grabowski, Virginia Werner, Mernlyn Goodrich, Theodore Kolodzyk, Judith Gorski, Linda Sutton , as the personal representative of the Estate of Mary Sutton and Alice Carey,<br>        Involuntary-Plaintiffs,<br>    v.<br>Cintas Corporation No. 2,<br>        Defendant-Third-Party Plaintiff-Appellant-Cross-Respondent,<br>The Travelers Indemnity Company of Connecticut,<br>        Defendant-Third-Party Plaintiff-Co-Appellant,<br>    v.<br>Becker Property Services LLC,<br>        Third-Party Defendant-Respondent-Cross-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 375 Wis. 2d 797, 899 N.W.2d 737
(2017 – Unpublished)

| | |
|---|---|
| OPINION FILED: | June 28, 2018 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 11, 2018 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | John J. DiMotto |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | A.W. BRADLEY, J., dissents, joined by ABRAHAMSON, J. (opinion filed). |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-respondent-cross-appellant-petitioner, there were briefs filed by *Patryk Silver*, *Esq.*, *Aaron R. Berndt*, *Esq.*, *Joshua B. Cronin*, *Esq.*, and *Borgelt*, *Powell*, *Peterson*, *and Frauen*, *S.C.*, Milwaukee. There was an oral argument by *Patryk Silver*, *Esq.*

For the defendant-third-Party plaintiff-appellant-cross respondent, there was a brief filed by *Lars E. Gulbrandsen*, *Jeffrey O. Davis*, *Leila N. Sahar*, and *Quarles & Brady LLP*, Milwaukee. There was an oral argument by *Lars E. Gulbrandsen*.

**2018 WI 81**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.  2015AP2457
(L.C. No.  2014CV3930)

STATE OF WISCONSIN             :        IN SUPREME COURT

American Family Mutual Insurance Company, State Auto Insurance Company of Wisconsin, Property and Casualty Insurance Company of Hartford, Fay Walters and Farmers Insurance Exchange,

        Plaintiffs,

H.O.L.I.E. of Greenfield Avenue, Inc., Dennis Kleinhans, Dorothy Grabowski, Virginia Werner, Mernlyn Goodrich, Theodore Kolodzyk, Judith Gorski, Linda Sutton, as the personal representative of the Estate of Mary Sutton and Alice Carey,

        Involuntary-Plaintiffs,

    v.

Cintas Corporation No. 2,

        Defendant-Third-Party

        Plaintiff-Appellant-Cross-Respondent,

The Travelers Indemnity Company of Connecticut,

        Defendant-Third-Party

        Plaintiff-Co-Appellant,

    v.

Becker Property Services LLC,

        Third-Party

**FILED**

**JUN 28, 2018**

Sheila T. Reiff
Clerk of Supreme Court

**Defendant-Respondent-Cross-Appellant-Petitioner.**

---

REVIEW of a decision of the Court of Appeals.  *Affirmed.*

¶1    DANIEL  KELLY,  J.   Becker  Property  Services  LLC ("Becker") and Cintas Corporation No. 2 ("Cintas") executed a contract  containing  indemnification  and  choice-of-law provisions.   A dispute arose over whether the contract entitles Cintas  to  indemnification  for  damages  caused  by  its  own negligence.   To  answer  that  question,  we  must  also  resolve  a threshold dispute:   As between Wisconsin and Ohio, which law provides the rule of decision?

¶2    We hold that Ohio's law governs the parties' contract, and  that  Becker  must  defend  and  indemnify  Cintas,  even  for damages caused by its own negligence.   Consequently, we affirm the  court  of  appeals,  but  (as  we  discuss  below)  on  other grounds.[1]

I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

¶3    A  2013  fire  at  Valentino  Square  (a  senior  living facility) caused approximately $900,000 in property damage after the  facility's  fire-suppression  sprinkler  system  allegedly

---

[1] This  is  a  review  of  an  unpublished  decision  of  the  court of appeals, American Family Mutual Insurance Co. v. Cintas Corp. No. 2, No. 2015AP2457, unpublished slip op. (Wis. Ct. App. Apr. 11, 2017), reversing an order of the Milwaukee County Circuit Court, the Honorable John J. DiMotto presiding.

failed.   Valentino Square's owner had contracted with Becker to manage the property.   In that capacity, Becker had contracted with Cintas[2] in 2012 to perform certain services, including regular inspections of the fire-suppression system (the "Contract").   The fire-suppression system allegedly failed because water in the system accumulated, froze, and then burst the pipes.

¶4   Plaintiffs (the owner of Valentino Square, several tenants, and the property insurers) sued Cintas, claiming the fire-suppression system's pipes would not have burst but for Cintas's negligent performance of its duties, or its breach of the Contract's implied warranty that it would perform its duties in a workmanlike manner.   Cintas tendered the defense of the matter to Becker pursuant to the Contract's indemnity clause.

¶5   When Becker rejected the tender, Cintas impleaded it as a third-party defendant.   Cintas sought indemnification for any damages for which it may be held liable to the plaintiffs, the costs of defense (including attorney's fees), and the costs of enforcing the indemnification provision (including attorney's fees).

¶6   Cintas moved for summary judgment on its claim that Becker breached its obligation to defend and indemnify.   Cintas asserted that Ohio law should provide the rule of decision by virtue of the Contract's choice-of-law provision.   Becker filed

---

[2] Cintas is incorporated in Ohio and has its principal place of business in Ohio.

a cross-motion for summary judgment, arguing that the Contract does not require it to defend or indemnify Cintas for its own negligence. Specifically, it argued that under Wisconsin law, contracts purporting to indemnify a party for its own negligence require a heightened level of clarity to be enforceable (the "strict construction" rule).[3] According to Becker, the strict construction of indemnification provisions is a public policy important enough to defeat the Contract's choice-of-law clause.

¶7 The circuit court denied Cintas's motion and granted Becker's. It agreed that the strict-construction rule embodied a public policy so important that the parties cannot be allowed to contract around it. It then concluded that the Contract's indemnification clause did not satisfy that rule. It said the Contract "does not have any specific and express statement . . . to the effect that Cintas gets coverage for its own negligent acts," and it does not convey that "the purpose and unmistakable intent of the parties in entering into the contract was for no other reason than to cover losses occasioned by the indemnitee's own negligence." However, the court added that, if Ohio law had applied instead, the indemnification

---

[3] Spivey v. Great Atl. & Pac. Tea Co., 79 Wis. 2d 58, 63, 255 N.W.2d 469 (1977) (stating that "[t]he general rule accepted in this state and elsewhere is that an indemnification agreement will not be construed to cover an indemnitee for his own negligent acts absent a specific and express statement in the agreement to that effect," and also establishing that "where the indemnitor, . . . is itself free of negligence, the obligation to indemnify an indemnitee for its own negligence must be clearly and unequivocally expressed in the agreement").

provision would have been sufficient to require Becker to indemnify Cintas for its own negligence. Consequently, the circuit court dismissed Cintas's third-party complaint against Becker.

¶8 The court of appeals reversed. It held that, even under Wisconsin law, the Contract required Becker to defend and indemnify Cintas for its own negligence and for the breach of implied warranty claim.[4] We granted Becker's timely petition for review, and now affirm.

## II. STANDARD OF REVIEW

¶9 The circuit court decided this matter on cross-motions for summary judgment. We review the disposition of such motions de novo, applying the same methodology the circuit courts apply. Green Spring Farms v. Kersten, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987); see also Borek Cranberry Marsh, Inc. v. Jackson Cty., 2010 WI 95, ¶11, 328 Wis. 2d 613, 785 N.W.2d 615 ("We review the grant of a motion for summary judgment de novo, . . . ."). First, we "examine the pleadings to determine whether a claim for relief has been stated." Green Spring Farms, 136 Wis. 2d at 315. Then, "[i]f a claim for relief has been stated, the inquiry . . . shifts to whether any factual issues exist." Id. Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

---

[4] The court of appeals did not address the choice-of-law question.

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2) (2015-16); see also Columbia Propane, L.P. v. Wis. Gas Co., 2003 WI 38, ¶11, 261 Wis. 2d 70, 661 N.W.2d 776 (citing Wis. Stat. § 802.08(2) (2001-02)).

¶10 The only dispute before us is the proper interpretation of a contract. This presents a question of law, which we review de novo. Deminsky v. Arlington Plastics Mach., 2003 WI 15, ¶15, 259 Wis. 2d 587, 657 N.W.2d 411 ("Interpretation of a contract is a question of law which this court reviews de novo."); see also Drinkwater v. Am. Family Mut. Ins. Co., 2006 WI 56, ¶14, 290 Wis. 2d 642, 714 N.W.2d 568 ("This choice-of-law determination is a question of law subject to independent appellate review."); Beilfuss v. Huffy Corp., 2004 WI App 118, ¶6, 274 Wis. 2d 500, 685 N.W.2d 373 ("Whether . . . the choice of forum clause and choice of law clause are enforceable requires interpretation of the employment agreement. Interpretation of a contract is a question of law which this court reviews de novo.").

III.  DISCUSSION

¶11 Before we can determine the enforceability of the Contract's indemnification provision, we must know which state's law to apply.  Therefore, we begin with whether we must honor the parties' agreement that Ohio's law controls the interpretation of their Contract.  We will then determine whether the Contract requires indemnification for Cintas's own negligence and the breach of implied warranty claim.

A.  Choice of Law

¶12 The parties agree that the Contract subjects itself to Ohio's law;[5] they disagree over whether we should enforce that provision.  Becker says doing so would obviate and bring to naught one of Wisconsin's important public policies, viz., the strict construction of indemnification promises.[6]  Cintas says a rule of construction cannot embody a public policy so important that it could nullify the parties' choice of controlling law.  For the following reasons, we agree with Cintas.

¶13 There is no doubt that, generally speaking, parties are free to choose the law governing their contracts.  Jefferis

_____

[5] The Contract says, in part:  "The rights and obligations of the parties contained herein shall be governed by the laws of the State of Ohio, excluding any choice of law rules which may direct the application of the laws of another jurisdiction."

[6] "In cases where the damage results solely from the negligence of the indemnitee, and the indemnitee seeks recovery from the indemnitor, this court and the overwhelming majority of other state courts apply the rule that the indemnity contracts will be strictly construed."  Algrem v. Nowlan, 37 Wis. 2d 70, 76, 154 N.W.2d 217 (1967).

v. Austin, 182 Wis. 203, 205, 196 N.W. 238 (1923) ("That parties to a contract may expressly or impliedly agree that the law of a jurisdiction . . . shall control is beyond question."). But there is a caveat: They may not use their freedom to escape "important public policies of a state whose law would be applicable if the parties['] choice of law provision were disregarded." Bush v. Nat'l Sch. Studios, Inc., 139 Wis. 2d 635, 642, 407 N.W.2d 883 (1987).

¶14 Therefore, our task is to decide whether our practice of strictly construing indemnification provisions embodies a public policy so important that parties may not avoid it. While we have previously said that "[a] precise delineation of those policies which are sufficiently important to warrant overriding a contractual choice of law stipulation is not possible,"[7] we have at least described some of the characteristics by which we might recognize them. They are policies that "make a particular type of contract enforceable," or that "make a particular contract provision unenforceable," or that "protect a weaker party against the unfair exercise of superior bargaining power by another party." Id. at 643. Courts (not necessarily ours) have seen those characteristics in, for example, usury laws, unconscionability doctrines, fair dealership laws, prohibitions

---

[7] Bush v. Nat'l Sch. Studios, Inc., 139 Wis. 2d 635, 643, 407 N.W.2d 883 (1987).

8

on covenants not to compete, and statutes of frauds.  Id. at 643 & n.1.[8]

¶15 Our strict construction rule contains none of the characteristics indicative of a policy that should trump a choice-of-law provision.  The rule does not address the enforceability of a type of contract, or a type of contract provision.  And it applies without respect to the parties' relative bargaining power.  The rule's function is simply to ensure the parties actually intended for the indemnitee to be indemnified not just for the negligence of others for which it might be responsible, but for the indemnitee's own negligence as well.  See, e.g., Hastreiter v. Karau Bldgs., Inc., 57 Wis. 2d 746, 748, 205 N.W.2d 162 (1973) ("The rule relied on by the tenant [i.e., strict construction of indemnification agreements that indemnify the indemnitees for their own negligence] is a rule of construction.  The purpose of the construction of an agreement is to ascertain the intent of the parties.").  As such, this is a rule of caution, not prohibition.

¶16 If a cautionary rule of construction were enough to nullify a choice-of-law provision, we would unnecessarily impair

---

[8] See also Kellogg v. Larkin, 3 Pin. 123, 137 (1851) ("Contracts against public policy are divided, by MR. STORY, into seven classes, as follows:  1. Contracts in restraint of trade;  2. Contracts in restraint of marriage;  3. Marriage brokerage contracts;  4. Wagers and gaming;  5. Contracts to offend against the laws and public duty;  6. Usury, and 7. Trading with an enemy.").

"certainty and predictability in contractual relations." See Bush, 139 Wis. 2d at 642; see also Thurner Heat Treating Co. v. Memco, Inc., 252 Wis. 16, 24, 30 N.W.2d 228 (1947) ("It is the policy of the law not only to encourage the embodiment of specific and material provisions in a contract, but in the interest of certainty and fair dealing, to require a plain and fair statement of terms."). Every law, whether statutory or common, is—at some level—an embodiment of policy. Because spotting the "important" public policies amongst all the rest is an inexact endeavor, we do well to keep that category narrowly focused. If it were to expand beyond its essential kernel, certainty and predictability in contractual relations would erode in like measure because parties would find it increasingly difficult to know which provisions or contracts a court might preempt. Expanding the "important" category far enough to reach our rule of strict construction would make virtually any contract provision potentially subject to the public policy caveat. And that would leave parties perennially wondering whether we will honor their choice-of-law decisions. We decline Becker's invitation to do so, and hold that our practice of strictly construing indemnification provisions is not so important that it will defeat a contract's choice-of-law provision.

¶17 We should not honor the choice-of-law provision, Becker said, for the additional reason that doing so would allow Cintas to escape Wisconsin's public policy that indemnification provisions of this sort must be conspicuous. Even if Becker is

right about the conspicuousness requirement (a subject we do not address), it provided no argument capable of invoking the "important public policy" exception to the rule that choice-of-law clauses are enforceable. Because every state law embodies a public policy, it is in the very nature of choice-of-law clauses that they substitute one state's policies for another. And still we enforce them. Under this exception, it is only when such clauses obviate an "<u>important</u> public policy" that we set them aside. Becker did not say why the conspicuousness requirement (if requirement it be) rises from the ranks of workaday public policies to join the elites that are so important we do not allow parties to contract around them. It provided no argument, no examples, no analogies——it did not even <u>call</u> this policy "important," much less provide a basis upon which we could declare it to be so. We will not develop an argument on Becker's behalf when Becker itself has chosen not to advance one. See <u>Clean Wis., Inc. v. Pub. Serv. Comm'n of Wis.</u>, 2005 WI 93, ¶180 n.40, 282 Wis. 2d 250, 700 N.W.2d 768 ("We will not address undeveloped arguments.").

¶18 Becker also argued that we should not enforce the choice-of-law provision because it is not conspicuous (that is, the provision is not set apart from the rest of the contract through a larger font, emphasis, or other mechanism designed to call a party's attention to it). It cites no authority for the proposition, but asserts that if the choice-of-law provision obviates a law that requires part of the contract to be conspicuous, then the choice-of-law provision must itself be

11

conspicuous. It says this must be so because "[t]he conspicuousness rule derives from the public policy requirement that the signer of a contract be unmistakably informed of the rights and duties at issue, in language that clearly and unequivocally communicates to the signer the nature and significance of the document being signed." The conclusion, however, does not follow from the premise. A conspicuous choice-of-law provision tells a contracting party nothing more about its indemnification obligations than an inconspicuous choice-of-law provision. It could be far and away the most conspicuous part of the contract and still it would merely tell the parties which state's law will control the contract. Its conspicuousness would hold no hint as to whether the selected state's laws are more or less favorable with respect to any given part of the contract.

¶19 We have never held that a contract's choice-of-law provision must be conspicuous, and we see no reason to do so today. Therefore, we will determine the enforceability and meaning of the Contract's indemnification provision using the law of the State of Ohio.

## B.  Indemnification

¶20 Becker argues that, even under Ohio law, the indemnification provision is unenforceable because it is ambiguous.[9]  The Contract says, in relevant part:

> Purchaser [Becker], at its own expense, shall defend, indemnify and hold harmless Seller [Cintas] from any claim, charge, liability, or damage arising out of any goods or services provided by Seller hereunder, including any failure of the goods or services to function as intended.  Purchaser acknowledges that Seller shall have no liability or responsibility for any loss or damage to persons or property resulting from any fire or equipment malfunction.

Becker says this language does not plainly state that Becker must indemnify Cintas for damages arising from Cintas's own negligence.

¶21 Ohio says the purpose of scrutinizing a contract is to find and apply the parties' intent:  "The cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties." Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth., 678 N.E.2d 519, 526 (Ohio 1997).  "The intent of the parties to a contract is presumed to reside in the language they chose to

---

[9] "Language is ambiguous if it is reasonably susceptible of two or more constructions." McClorey v. Hamilton Cty. Bd. of Elections, 720 N.E.2d 954, 957 (Ohio Ct. App. 1998).  "A contract 'does not become ambiguous by reason of the fact that in its operation it will work a hardship upon one of the parties thereto.'"  Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth., 678 N.E.2d 519, 526-27 (Ohio 1997) (quoting Ohio Crane Co. v. Hicks, 143 N.E. 388, 389 (Ohio 1924) (per curiam)).

employ in the agreement." Id. (quoted source omitted); see also Worth v. Aetna Cas. & Sur. Co., 513 N.E.2d 253, 256 (Ohio 1987) ("The nature of an indemnity relationship is determined by the intent of the parties as expressed by the language used."). In applying that language, "common words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument." Alexander v. Buckeye Pipe Line Co., 374 N.E.2d 146, 150 (Ohio 1978).

¶22 With respect to any alleged ambiguity in contractual language, the rule in Ohio is that "quoties in verbis nulla est ambiguitas ibi nulla expositia contra verba fienda est." Lawler v. Burt, 7 Ohio St. 340, 349-50 (Ohio 1857) (quoted source omitted). That is to say, "[i]n the absence of ambiguity, no exposition shall be made which is opposed to the express words of the instrument." Herbert Broom, A Selection of Legal Maxims, Classified and Illustrated 176 (1845); Alexander, 374 N.E.2d at 150 ("[W]here the terms in an existing contract are clear and unambiguous, this court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties.").

¶23 The Contract's indemnification provision is not ambiguous. To the contrary, any greater explicitness regarding its coverage of Cintas's own negligence would come at the cost of the provision's broad scope. The duty to defend and indemnify applies to "any claim, charge, liability, or damage

14

arising out of <u>any</u> goods or services provided by Seller [Cintas]." (Emphasis added.) The term "any," of course, admits of no exceptions. And that term describes both the nature of the attempt to hold Cintas liable (claims, charges, etc.), as well as the source of harm (goods or services). With respect to the latter, the Contract even repeats itself for clarity, stating that the duty to defend and indemnify "include[es] any failure of the goods or services to function as intended." The "goods and services" to which this phrase refers, of course, are those supplied by Cintas. The indemnification provision left no possible misunderstanding about the effect of its language. The same paragraph goes on to say that "Purchaser [Becker] acknowledges that Seller [Cintas] shall have no liability or responsibility for any loss or damage to persons or property resulting from any fire or equipment malfunction." Cintas would have no such liability or responsibility because of the immediately preceding sentence, which made that loss or damage Becker's responsibility.

¶24 We could not say this language does not cover Cintas's own negligence without doing considerable damage to the Contract. First, we would need to remove the term "any" each time it appears in the indemnification provision to create the possibility that some claims or causes of damage might not be included. But that would still leave Becker's acknowledgement that the effect of the indemnification language would leave Cintas free of any responsibility for damage or loss consequent upon a fire or equipment malfunction. Therefore, Becker's

15

preferred reading would require elimination of the entire sentence containing that acknowledgment.  In sum, we would need to eliminate over half of the Contract's indemnification provision just so it could plausibly be called ambiguous.  Neither logic nor Ohio's law requires us to excise language for the purpose of creating an ambiguity that could then be exploited by one of the parties to the Contract.

¶25 Nonetheless, Becker says other contractual provisions, read in conjunction with the indemnification language, make the duty to defend and indemnify ambiguous.[10]  Specifically, it calls our attention to the language on the first page of the Contract promising that "[a]ll work performed will be according to NFPA, State, and City Fire Department requirements and is <u>guaranteed</u>, <u>insured</u> and done by licensed personnel."  (Emphasis added.)  Neither a guaranty nor a promise of insurance means anything, it reasons, if the indemnification provision shields Cintas from any and all responsibility for the goods and services it provides.

¶26 This argument has some superficial attractiveness, but it ultimately cannot bear the weight Becker assigns it.  Becker

_____

[10] We understand Becker's argument as encouraging us to respect Ohio's recognition that "[a] fundamental principle of contract construction requires that the document be read as a whole." <u>Monsler v. Cincinnati Cas. Co.</u>, 598 N.E.2d 1203, 1209 (Ohio Ct. App. 1991); <u>see also</u> <u>McClorey</u>, 720 N.E.2d at 956 ("In the construction of a written contract, it will be read as a whole, and the intent of each part will be gathered from a consideration of the whole.").  We agree that Ohio's law requires us to read the Contract as a whole.

16

believes that, if the indemnification provision really does excuse Cintas from responsibility for its own negligence, then the promise of guaranteed work must be illusory. However, neither provision negates or makes the other ambiguous because the Contract actually does contain a guaranty. It provides that "[c]laims for defective goods or negligent services must be made within thirty (30) days after delivery and Purchaser's exclusive remedy shall be, at Seller's option, replacement of the defective goods or remedying of any negligence in services or credit or refund of the purchase price paid." Becker offers no authority for the proposition that a limited guaranty is necessarily inconsistent with an indemnification provision that covers the indemnitee's own negligence. Nor is there any readily-apparent reason that the two provisions cannot comfortably coincide in the same contract. And if they can co-exist, we must give effect to both terms. German Fire Ins. Co. v. Roost, 45 N.E. 1097, 1099 (Ohio 1897) ("[N]o provision [of a contract] is to be wholly disregarded because [it is] inconsistent with other provisions, unless no other reasonable construction is possible, . . . . If reasonable effect can be given to both, then both are to be retained.").

¶27 The Contract's promise that all work would be insured is similarly incapable of calling the indemnification provision's meaning into question. Buying an insurance policy does not create exposure to liability otherwise disclaimed. Nor could Cintas's representation that it has such a policy create in Becker a contract-based expectation that Cintas would accept

17

liability for the risks covered by the policy. With respect to which party will shoulder the responsibility to defend and indemnify Cintas, the representation that Cintas carries an insurance policy is, at most, a nebulous suggestion that an insurance company is available to discharge that duty. In contrast, the Contract's indemnification provision is a specific and explicit mandate that Becker must accept that responsibility to defend and indemnify Cintas. So even if there were a conflict between the Contract's representation regarding insurance and its indemnification provision (and we do not believe there is), the specific provision would control. See Marusa v. Erie Ins. Co., 991 N.E.2d 232, 235 (Ohio 2013) ("When faced with provisions that are arguably in conflict, we apply the more specific provision."); German Fire Ins. Co., 45 N.E. at 1099 ("[A] special provision will be held to override a general provision only where the two cannot stand together. If reasonable effect can be given to both, then both are to be retained.").

¶28 The Contract's indemnification provision is not ambiguous. Therefore, we hold that it plainly requires Becker to defend and indemnify Cintas in the underlying action, even with respect to Cintas's own negligence.

*

¶29 Ohio's law as it specifically relates to indemnification agreements confirms our conclusion.[11] Ohio courts examine such agreements just like any other. <u>Portsmouth Ins. Agency v. Med. Mut. Of Ohio</u>, 934 N.E.2d 940, 944 (Ohio Ct. App. 2009) ("Indemnity agreements must be interpreted in the same manner as other contracts."). And they are enforceable to the extent they do not contradict Ohio's public policy. <u>Glaspell v. Ohio Edison Co.</u>, 505 N.E.2d 264, 266 (Ohio 1987) ("[A]bsent specified public policy exceptions, the law of Ohio generally allows enforcement of indemnity agreements."). But the public policy exceptions are to be narrowly applied:

> In a free and democratic society, freedom of contract is the general rule; public-policy limits are the exception. The doctrine does not grant courts a roving commission to police the terms of agreements and must be cautiously applied lest the exception swallow the rule. The Ohio Supreme Court has repeatedly admonished the courts against the loose application of "public policy" to invalidate agreements, even in the context of ordinary contracts between private parties . . . .

---

[11] Becker argued that an indemnification provision that indemnifies an indemnitee for its own negligence must be conspicuous under Wisconsin's law, citing Wis. Stat. § 401.201(2)(f) (2015-16) and <u>Deminsky v. Arlington Plastics Machinery</u>, 2003 WI 15, 259 Wis. 2d 587, 657 N.W.2d 411. However, it offered no similar argument with respect to Ohio's law. We generally do not address arguments the parties have not made, and we see no reason to depart from that tradition here. <u>See Clean Wis., Inc. v. Pub. Serv. Comm'n of Wis.</u>, 2005 WI 93, ¶180 n.40, 282 Wis. 2d 250, 700 N.W.2d 768 ("We will not address undeveloped arguments.").

Stickovich v. City of Cleveland, 757 N.E.2d 50, 59 (Ohio Ct. App. 2001). The parties have not identified, nor have we found, any public policy forbidding indemnification provisions in the type of contract between Cintas and Becker.[12]

¶30 Indemnification agreements covering the indemnitee's own negligence are enforceable as well. However, Ohio has a rule of strict construction similar to our own: "Where it is alleged that the agreement protects an indemnitee from the financial consequences of his own negligence, the greater weight of authority, particularly in Ohio, would construe the words of such an agreement most narrowly." Glaspell, 505 N.E.2d at 266. The rule applies when the contracting parties have such disparate bargaining power that one can impose inequitable conditions on the other. See Coulter v. Dayton Power & Light Co., 731 N.E.2d 1172, 1175 (Ohio Ct. App. 1999) ("[T]he rule of narrowly construing this type of indemnification agreement had been developed to protect a contracting party in a disparately weaker bargaining position from the stronger party's attempt to impose wholly inequitable burdens upon the weaker party.").

¶31 The strict construction rule does not apply, however, "when such burden of indemnification was assented to in a context of free and understanding negotiation." Glaspell, 505

---

[12] Ohio does not allow indemnification agreements in construction contracts, employment contracts, or illegal contracts. See Worth v. Aetna Cas. & Sur. Co., 513 N.E.2d 253, 257 (Ohio 1987); Glaspell v. Ohio Edison Co., 505 N.E.2d 264, 266 (Ohio 1987) (citing cases).

20

N.E.2d at 266. That context typically is present when the contracting parties are capable business entities. See id. at 267 ("The parties in the case before us are commercial enterprises of sufficient size and quality as to presumably possess a high degree of sophistication in matters of contract."); Prudential Ins. Co. of Am. v. Corp. Circle, Ltd., 658 N.E.2d 1066, 1069 (Ohio Ct. App. 1995) ("While clauses limiting the liability of the drafter are ordinarily strictly construed, such strict construction need not be applied in the interpretation of an exculpation or indemnification agreement entered into between business entities in a context of free and understanding negotiation." (emphasis omitted)).

¶32 We think Becker is sufficiently sophisticated that it does not fall within the category of parties the strict construction rule is meant to protect. Although the record does not disclose a great deal about Becker, the Contract discloses that it manages at least ten apartment complexes in southeastern Wisconsin. Managing that number of properties requires at least some familiarity with matters of contract. It also suggests that Becker is in a position to intelligently negotiate the economic terms of its contracts without being overborne by its counterparties.

¶33 However, even if we were to conclude that Becker is entitled to the protection offered by the rule of strict construction, the Contract's indemnification provision more than adequately expresses the intention that Cintas would be

21

indemnified for its own negligence. Ohio's Supreme Court described this rule as follows:

> "Such an interpretation should not be given a contract that would make the appellant responsible for the consequence of a negligent act of the appellee unless no other meaning can be ascribed to it. If a doubt existed as to its meaning, the court would resolve that doubt against the contention that the contract was intended to indemnify appellee against its own negligence. Every presumption is against such intention."

George H. Dingledy Lumber Co. v. Erie R. Co., 131 N.E. 723, 725 (Ohio 1921) (quoting Mitchell v. S. Ry. Co., 74 S.W. 216, 217 (Ky. Ct. App. 1903)). Ohio law does not, however, "require that contracts purporting to hold an indemnitee harmless for its own negligence contain express language to that effect." Coulter, 731 N.E.2d at 1174.

¶34 In this case, the same characteristics that make the Contract's indemnification provision unambiguous also demonstrate it satisfies the requirements of the strict construction rule. Interpreting the Contract to not cover Cintas's own negligence would require a wholesale revision to so much language that we would be essentially reconstructing the agreement on behalf of Becker to avoid a conclusion favorable to Cintas. "[N]o other meaning can be ascribed to" the indemnification provision than the one we have described. See George H. Dingledy Lumber Co., 131 N.E. at 725 (quoted source omitted). Nor is there any "doubt . . . as to its meaning." See id.

22

IV.  CONCLUSION

¶35 The parties agreed that Ohio law would control the Contract, and no public policy requires us to preempt their agreement.  The Contract's indemnification agreement unambiguously requires Becker to defend and indemnify Cintas even for its own negligence, and this is true regardless of whether we apply Ohio's rule of strict construction.  Therefore, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶36 ANN WALSH BRADLEY, J. *(dissenting).* "All work performed will be . . . insured." This language is on the first page of the contract between Cintas and Becker, in bold type. A reasonable person reading this contract language would think that it means what it says. But not the majority. In the majority's view, this unequivocal language is transformed to mean only that Cintas "carries an insurance policy." Majority op., ¶27.

¶37 Rather than giving effect to this language, the majority instead enforces a liability-shifting provision set forth in the finest of fine print. The effect is that, yes, Cintas's work is "insured," but not by Cintas. Instead, the liability-shifting indemnity provision foists liability for Cintas's own negligence onto Becker. The indemnity provision appears in miniscule type as part of an identically-styled laundry list that cannot be easily read without a magnifying glass.

¶38 The general rule of law in Wisconsin (as well as in Ohio) is that an indemnification provision will not be construed to cover an indemnitee for its own negligent acts unless there is a clearly expressed statement to that effect. Spivey v. Great Atlantic & Pac. Tea Co., 79 Wis. 2d 58, 63, 255 N.W.2d 469 (1977); see George Dingledy Lumber Co. v. Erie R. Co., 131 N.E. 723, 725 (Ohio 1921). Likewise, Wisconsin's strong public policy is that such agreements must be conspicuous lest they be deemed unconscionable. See Deminsky v. Arlington Plastics Machinery, 2003 WI 15, ¶¶26-27, 259 Wis. 2d 587, 657 N.W.2d 411.

1

¶39 Whether it be under Wisconsin or Ohio law, an ambiguous provision cannot be enforced. Additionally, Ohio law cannot be invoked to circumvent important Wisconsin public policy considerations. Because the indemnification provision here is both ambiguous and unconscionably inconspicuous, the majority's application of Ohio law must fail.

¶40 Accordingly, I respectfully dissent.

I

¶41 Becker Property Services contracted with Cintas to perform regular inspections of the fire-suppression system in a property Becker managed. Majority op., ¶3. The fire-suppression system allegedly failed and a fire in the property caused approximately $900,000 in damages. Id.

¶42 The property owner, several building tenants, and the property's insurers sued Cintas for negligence and breach of implied warranty. Id., ¶4. Pursuant to an indemnity provision in the contract, Cintas sought to have Becker indemnify Cintas for Cintas's own negligence. Id.

¶43 The majority first enforces a choice of law provision in the contract between Cintas and Becker that requires the use of Ohio law. Id., ¶2. Second, applying Ohio law, it ultimately concludes that the indemnity provision is enforceable. Id. Consequently, it determines that Becker must indemnify Cintas for Cintas's own negligence.

II

¶44 At the outset, the majority missteps in framing what it refers to as the threshold question: "As between Wisconsin

2

and Ohio, which law provides the rule of the decision?" Majority op., ¶1. The question, as framed, assumes that Ohio is qualified to be a contender. It is not.

¶45 In framing the "threshold" issue in this fashion, the majority is able to avoid addressing the real threshold issues that would prove fatal to its conclusion. If the language of the contract is ambiguous, under either Wisconsin or Ohio law, the majority's conclusion cannot stand. Next, even if the language of the liability-shifting indemnity provision is unambiguous, if it contravenes important Wisconsin public policy, Ohio law cannot be enforced. An examination of these issues renders Ohio unqualified to even be in the ring.

¶46 The majority errs in three significant ways. First, it overlooks a substantial ambiguity in the contract, misconstruing a promise that Cintas's work is "insured." Second, it disregards the indemnity clause's inconspicuous nature, giving effect to a liability-shifting provision that appears in the middle of a block of text, that is so small as to be barely legible, and is not set off from the surrounding text or emphasized in any way. Third, it ignores important Wisconsin public policy considerations and erroneously applies Ohio law to this dispute. I address each in turn.

A

¶47 The majority errs first when it overlooks the ambiguity created by Cintas's promise that its work is "insured." On the first page of the contract, in bold type is the statement: "All work performed will be according to NFPA,

3

State, and City Fire Department requirements and is guaranteed, <u>insured</u> and done by licensed personnel" (emphasis added). From this language, it is reasonable to conclude that the work is insured by the drafter of the contract, Cintas.

¶48 However, the contract also contains the indemnity provision, which states:

> Indemnity. Purchaser, at its own expense, shall defend, indemnify and hold harmless Seller from any claim, charge, liability, or damage arising out of any goods or services provided by Seller hereunder, including any failure of the goods or services to function as intended[.] Purchaser acknowledges that Seller shall have no liability or responsibility for any loss or damage to persons or property resulting from any fire or equipment malfunction.

This provision shifts liability from Cintas to Becker, even in situations of Cintas's own negligence.

¶49 In Wisconsin, the general rule is that "an indemnification agreement will not be construed to cover an indemnitee for his own negligent acts absent a specific and express statement in the agreement to that effect." <u>Spivey</u>, 79 Wis. 2d at 63. Such indemnity agreements are subject to strict construction. <u>Id.</u>

¶50 The <u>Spivey</u> court explained the two ways in which an obligation to indemnify an indemnitee for its own negligence will be upheld: (1) if the agreement clearly and unequivocally states that the indemnitee is to be covered for losses occasioned by his own negligent acts; and (2) "if it is clear that the purpose and unmistakable intent of the parties in entering into the contract was for no other reason than to cover

4

losses occasioned by the indemnitee's own negligence . . . ." Id. at 63-64.

¶51 Similarly, as the majority provides, the rule in Ohio is that if the liability-shifting indemnity provision is ambiguous, then the provision cannot be enforced:

> Such an interpretation should not be given a contract that would make the appellant responsible for the consequence of a negligent act of the appellee unless no other meaning can be ascribed to it. If a doubt existed as to its meaning, the court would resolve that doubt against the contention that the contract was intended to indemnify appellee against its own negligence. Every presumption is against such intention.

Majority op., ¶33 (citing George H. Dingledy Lumber Co., 131 N.E. at 725).

¶52 Far from being clear and unequivocal, the contract in this case is contradictory and therefore ambiguous. The bold type on the first page of the contract and the indemnity provision, when read together, are hopelessly ambiguous regarding whose responsibility it is to provide insurance for Cintas's work.

¶53 To explain, the bold type on the first page says that Cintas's work is insured. A reasonable reader would interpret this as meaning that Cintas would insure its own work. A reasonable reader would not read this language as the majority does, to indicate merely that Cintas "carries an insurance policy." See majority op., ¶27.

¶54 However, the indemnity clause says the work is insured, but not by Cintas. The indemnity clause thus shifts liability for the work to Becker. This of course conflicts with

5

the exhortation that the work is "insured," rendering the contract as a whole irreconcilably ambiguous.

¶55 Under both Wisconsin and Ohio law, this ambiguity requires construing the contract against Cintas. The contract does not "clearly and unequivocally" provide that Becker is to indemnify Cintas for its own negligence. See Spivey, 79 Wis. 2d at 63. There is certainly another meaning that can be ascribed to it. See George H. Dingledy Lumber Co., 131 N.E. at 725. Accordingly, I determine that the indemnity provision, is unenforceable because it is ambiguous.

B

¶56 In addition to being ambiguous, the indemnity provision is also inconspicuous pursuant to Wisconsin law. This court in Deminsky announced the bright line requirement that "indemnity contracts in which parties agree to indemnify the indemnitee for the indemnitee's own negligence" must be conspicuous. 259 Wis. 2d 587, ¶28. The issue in Deminsky arose in the context of the indemnitor's argument that the indemnity provision at issue was unconscionable because it was inconspicuous. Id., ¶26.

¶57 The standard for conspicuousness in indemnity contracts is set forth in Wis. Stat. § 401.201(2)(f).[1] Id., ¶28. A term is "conspicuous" if any of the following apply:

---

[1] At the time Deminsky was decided, this conspicuousness standard was set forth in Wis. Stat. § 401.201(10). This statute has since been renumbered to § 401.201(2)(f). See 2009 Wis. Act 320.

6

1. A heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size.

2. Language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

§ 401.201(2)(f).

¶58 Applying the statute's conspicuousness standard to the facts of this case, the indemnity provision here is undoubtedly inconspicuous. First, the font size is incredibly small. Counsel for Becker brought a magnifying glass with him to oral argument in this case to facilitate reading the provision, and with good reason.[2]

¶59 Second, the entirety of the terms and conditions set forth in the contract look exactly the same. The indemnity provision is only one of seventeen identical-looking, fine-print sections contained on the eighth and ninth pages of the nine-page contract. The indemnity provision has no heading, capitalization, bolding, italics, or underlining of any kind. Nothing about the provision grabs the reader's attention in any

---

[2] The inconspicuous nature of the indemnity provision is demonstrated by a glance at the terms and conditions section of the contract, which is included as an appendix to this dissent. I direct the reader's attention to the indemnity provision, which is paragraph ten in the list of 17 items, all of which are set forth in what Becker maintains is 4.5 point font.

way.[3]  Accordingly, I determine that the indemnity provision is inconspicuous and therefore unenforceable under Wisconsin law.

C

¶60  The preceding analysis of Deminsky's conspicuousness requirement informs my analysis of the choice of law provision. According to the choice of law provision, "The rights and obligations of the parties contained herein shall be governed by the laws of the State of Ohio, excluding any choice of law rules which may direct the application of the laws of another jurisdiction."

¶61  Wisconsin courts have acknowledged that parties to a contract may expressly agree that the law of a particular jurisdiction shall control their contractual relations. Bush v. National Sch. Studios, Inc., 139 Wis. 2d 635, 642, 407 N.W.2d 883 (1987) (citations omitted).  However, this proposition is by no means unqualified. Id.  Parties cannot agree to be bound by the law of a particular jurisdiction "at the expense of important public policies of a state whose law

---

[3] In cases finding a contract provision to be conspicuous and enforceable there was some important characteristic to the provision that is lacking in this case. See Deminsky v. Arlington Plastics Machinery, 2003 WI 15, ¶29, 259 Wis. 2d 587, 657 N.W.2d 411 (highlighting the fact that the indemnity provision at issue had a heading in capital letters and bold print); Rainbow Country Rentals and Retail, Inc. v. Ameritech Publ'g, Inc., 2005 WI 153, ¶42, 286 Wis. 2d 170, 706 N.W.2d 95 (emphasizing the fact that the liquidated damages provision at issue contained a specific reference in capital letters to a paragraph placing a limitation on available remedies).

would be applicable if the parties choice of law provision were disregarded." Id.

¶62 In concluding that Ohio law applies, the majority addresses the choice of law provision without reference to the indemnity provision's conspicuity. Yet, before determining whether the choice of law provision applies, one must determine first if there is an "important public policy" at stake. See id.

¶63 The majority refuses to address Becker's argument that the indemnification provision must be conspicuous under Wisconsin law because "it offered no similar argument with respect to Ohio's law." Majority op., ¶29 n.11. This analysis puts the cart before the horse. Rather than diving into the application of Ohio law, the majority should instead have initially scrutinized Wisconsin's important public policy regarding the unconscionability of inconspicuous liability-shifting provisions. Such an analysis leads me to conclude that Ohio law does not apply to this dispute in the first instance.

¶64 The Bush court declined to provide an exhaustive list of public policies that would render a choice of law provision null. However, it specifically referenced laws "which make a particular contract provision unenforceable," such as "unconscionability doctrines," as sufficiently important to justify disregarding a contract's choice of law provision. Bush, 139 Wis. 2d at 643, 643 n.1. The bright line conspicuousness requirement announced in Deminsky is rooted in the doctrine of unconscionability. See Deminsky, 259

9

Wis. 2d 587, ¶¶26-27; see also Yauger v. Skiing Enters., Inc., 206 Wis. 2d 76, 86-87, 557 N.W.2d 60 (1996).

¶65  An unconscionability doctrine is an "important public policy" identified by the Bush court.  This policy would be circumvented if we gave effect to the choice of law provision.[4] Therefore, the choice of law provision's selection of Ohio law is unenforceable.[5]  Accordingly, I determine that Wisconsin law applies.[6]

¶66  For the foregoing reasons, I respectfully dissent.

¶67  I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.

---

[4] My research has revealed no Ohio case establishing a similar conspicuousness rule to that announced in Deminsky, 259 Wis. 2d 587.

[5] Further, it would render Deminsky's conspicuousness requirement entirely toothless if a party could avoid the requirement by way of a choice of law provision that is itself inconspicuous. See Appendix, ¶15.

[6] I further observe that the majority's analysis results in an opinion of limited value in either Wisconsin or Ohio.  What is the precedential value of a Wisconsin court's interpretation of Ohio law?  Its application appears to be limited to this specific situation——where a choice of law provision results in a Wisconsin court applying Ohio law.

10



CINTAS FIRE PROTECTION

TERMS AND CONDITIONS OF SALE - FIRE EQUIPMENT GOODS AND SERVICES

1. Acceptance and Modification. These Terms and Conditions supplement the price quotation, purchase order, contract, agreement or order acknowledgment (collectively the "Contract") entered into between Cintas Fire Protection or its parent ("Seller") and Seller's customer ("Purchaser") and is a part of or supplement to such Contract and these Terms and Conditions may not be modified, amended or waived except in writing signed by Seller's duly authorized representative. Seller hereby objects to any additional or different terms or conditions, whether or not material, proposed in Purchaser's purchase order or in any acknowledgment, supplement or confirmation of the Contract not executed by Seller. Purchaser agrees that the terms and conditions set forth herein shall govern the relationship between Seller and Purchaser with respect to the goods and services that are the subject matter hereof, and no other terms or conditions not specifically agreed upon by Seller shall be binding upon Seller. Purchaser accepts the terms hereof by acknowledging or confirming the Contract, commencing performance, by accepting delivery of goods or services from Seller or by any other means manifesting assent to be bound.

2. Orders. Seller shall use its best efforts to deliver goods as ordered by Purchaser and to provide services when requested, but as long as Seller acts in good faith and with due diligence, Seller shall not be responsible or liable for any delays.

3. Prices, Taxes and Other Fees. Prices may be increased at any time without prior notice. Purchaser shall pay the price in effect at time of shipment or when services are provided. Any sales, use or other similar tax or duties, customs, tariffs, imposts, surcharges or other fees imposed by any governmental authority on goods shipped by Seller shall be added to the price to be paid by Purchaser unless a valid sales tax exemption certificate is furnished to Seller.

4. Service Charges. Service charges are used to help Seller pay various fluctuating current and future costs including, but not limited to, costs directly or indirectly related to the environment, energy issues, service and delivery of goods and services, in addition to other miscellaneous costs incurred or that may be incurred by Seller.

5. Equipment Exchange. Purchaser hereby understands and agrees that in servicing Purchaser's fire equipment Seller intends to exchange Purchaser's fire equipment for Seller's fire equipment of similar kind and quality. Purchaser further acknowledges and agrees that upon completion of such exchange that all right, title and interest in the Purchaser's fire equipment so exchanged will belong to Seller and all right, title and interest in Seller's fire equipment so exchanged will belong to Purchaser.

6. Credit. Payment terms may be changed at any time with or without prior notice and are those in effect at time of delivery or service call. Any invoice not paid when due shall be subject to a late charge of one and one-half percent (1-1/2%) per month or portion thereof or, if lower, the highest rate allowable under applicable law. Invoices shall be due within ten (10) days of invoice date unless otherwise stated. If, in Seller's opinion, Purchaser's credit becomes unsatisfactory, Seller may, in addition to all other rights and remedies under the Contract and applicable law, suspend the delivery of goods or services pending receipt of cash or satisfactory security from Purchaser. Should Purchaser default in any payments due Seller, Purchaser agrees to pay all reasonable costs of collection incurred by Seller including reasonable attorneys' fees. Title to all equipment or other goods sold by Seller shall remain in Seller's name until Purchaser has paid Seller in full. Seller shall retain a security interest in such equipment or other goods until such time.

7. Inspection. Seller strongly recommends that Purchaser conduct an on-site inspection of the goods and services sold hereunder after delivery, installation or other service call. Seller shall not be responsible for the consequences of Purchaser's failure to inspect the goods or services or for any defects, malfunctions, inaccuracies, insufficiencies or omissions in such goods or services.

8. Limited Warranty; Liability Limitation. Because of the great number and variety of applications for which Seller's goods and services are purchased, Seller does not recommend specific applications or assume any responsibility for use, results obtained or suitability for specific applications. Purchaser is cautioned to determine the appropriateness of Seller's goods and services for Purchaser's specific application before ordering and to test and evaluate thoroughly all goods before use. Seller warrants that title to all goods sold by Seller shall be good and marketable. THERE ARE NO OTHER WARRANTIES EXPRESSED OR IMPLIED IN CONNECTION WITH THE SALE OF GOODS INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. NO DISCLAIMER, EXCLUSION, LIMITATION OR MODIFICATION OF ANY OF THE AFORESAID WARRANTIES SHALL BE DEEMED EFFECTIVE UNLESS IN WRITING SIGNED BY SELLER. SELLER DOES NOT WARRANT THAT ANY GOODS OR SERVICES PROVIDED WILL BE IN COMPLIANCE WITH ANY STATUTE, RULE, REGULATION, ORDINANCE OR OTHER LAW. SELLER SHALL IN NO EVENT BE LIABLE TO PURCHASER OR ANY OF ITS SUCCESSORS OR ASSIGNS FOR ANY LOSS, CLAIM, DEMAND, LIABILITY, COST, DAMAGE, EXPENSE, LOSS OF BUSINESS PROFITS, OR ANY PUNITIVE, CONSEQUENTIAL, INCIDENTAL OR SPECIAL DAMAGES, WHETHER ARISING IN TORT, CONTRACT, WARRANTY, STRICT LIABILITY OR OTHERWISE.

9. Claims. Claims for defective goods or negligent services must be made within thirty (30) days after delivery and Purchaser's exclusive remedy shall be, at Seller's option, replacement of the defective goods or remedying of any negligence in services or credit or refund of the purchase price paid. Seller shall be given a reasonable opportunity to investigate any claims. Neither Purchaser nor Seller shall be liable for incidental, consequential, indirect, special, exemplary or punitive damages for default, and Seller shall not be liable for any claim in excess of the purchase price of the goods or services to which the claim relates, whether involving defective goods or negligent services otherwise arising in contract or tort, including strict liability and negligence.

10. Indemnity. Purchaser, at its own expense, shall defend, indemnify and hold harmless Seller from any claim, charge, liability, or damage arising out of any goods or services provided by Seller hereunder, including any failure of the goods or services to function as intended. Purchaser acknowledges that Seller shall have no liability or responsibility for any loss or damage to persons or property resulting from any fire or equipment malfunction.

11. Insurance. Purchaser understands and agrees that protection for the above-referenced costs, expenses, losses and damages is Purchaser's sole responsibility and that it is Purchaser's responsibility to obtain and maintain insurance coverage for such costs, expenses, losses and damages. Purchaser releases and waives all rights of recovery against Seller by way of subrogation.

12. Clerical Errors; Other Contracts. Any clerical errors contained in the Contract or other documents in connection therewith are subject to correction. Purchaser represents that the Contract does not infringe on any other contract to provide similar goods or services that Purchaser is a party to.

13. Force Majeure. Seller shall not be responsible or liable for failure to perform attributable to any cause or contingency beyond its reasonable control including, without



limitation, act of God; act or omission of civil or military authority; fire; flood; tempest; epidemic; earthquake; volcanic activity, quarantine restriction; labor dispute (e.g. lockout, strike or work stoppage or slowdown); embargo; war; riot; unusually severe weather; accidents; political strife; act of terrorism; delay in transportation; compliance with any regulation or directive or any national, state or local government, or any department or agency thereof; or any other cause which by the exercise of reasonable diligence Seller is unable to overcome.

14. Entire Agreement. The terms and conditions contained herein (and contained on Seller's quotation, specifications, order, acknowledgment, contract, agreement, invoice or other form) constitutes the entire agreement between the parties with respect to the subject matter contained herein and supersedes all prior agreements and understandings between the parties and any customary terms and conditions of purchase that Purchaser may establish from time to time. The terms and conditions contained herein may be modified only by a writing signed by both parties. Purchaser acknowledges and agrees that except as otherwise contained in the Contract the terms and conditions contained herein shall be the exclusive terms and conditions binding the parties hereto and that any additional contradictory or different terms contained in any initial or subsequent Contract or communication from Purchaser pertaining to the goods or services to be provided by Seller are hereby objected to and shall be of no effect. No course of prior dealings between Purchaser and Seller and no usage of the trade shall be relevant to supplement or explain any terms used herein. Acceptance or acquiescence in a course of performance rendered hereunder shall not be relevant to determine the meaning of this agreement even though the accepting or acquiescing party has knowledge of the nature of the performance and the opportunity for objection.

15. Governing Law; Disputes. The rights and obligations of the parties contained herein shall be governed by the laws of the State of Ohio, excluding any choice of law rules which may direct the application of the laws of another jurisdiction. Any dispute or matter arising in connection with or relating to the Contract shall be resolved by binding and final arbitration under applicable state or federal laws providing for the enforcement of agreements to arbitrate disputes. Any such dispute shall be determined on an individual basis, shall be considered unique as to its facts, and shall not be consolidated in any arbitration or other proceeding with any claim or controversy of any other party.

16. Notices. Any notice given pursuant to the Contract shall be in writing and sent by certified mail, postage prepaid, return receipt requested, to the appropriate party at the address set forth in the purchase order, contract or agreement or at such other address as such party may provide in writing to the other party. Any such notice shall be effective upon the receipt thereof.

17. Miscellaneous. Purchaser may not assign its rights or delegate its performance in whole or in part under the Contract without the prior written consent of Seller and any attempted assignment or delegation without such consent shall be void. If any provision of the Contract or these Terms and Conditions is determined illegal or unenforceable, it shall not affect the enforceability of any other provision or paragraph of the Contract or these Terms and Conditions. In the event any party institutes legal proceedings to enforce its respective rights arising out of the Contract or these Terms and Conditions, the prevailing party shall be entitled to the award of attorney's fees and court costs, plus cost of executing, enforcing and/or collecting any judgment at all trial and appellate levels.

IN WITNESS WHEREOF, the parties have executed this Contract effective the day and year set forth above.